**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SYDNEY LERMA, as Independent Administrator of the Estate of KRISTOPHER KRAMER** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | No.  3:22 C 50369 |
| **BRIAN BOLLOW, JUSTIN DONAHUE, SONNY STREIT, JOSEF GORDON, ROBERT REDEL, and CITY OF DEKALB,** | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Kristopher Kramer called 911 in the early hours on October 25, 2021; a short time later, Kramer was shot by police and taken to a hospital, where he died.  At the time of his 911 call, Kramer was experiencing a mental health crisis and was heavily intoxicated.  He told the dispatcher he wanted his girlfriend to leave his home, but threatened that if police officers came, he would commit suicide, possibly by pointing a weapon at an officer, thus forcing the officer to shoot him.  A team of DeKalb police officers, including Officers Brian Bollow and Josef Gordon, responded to the dispatch.  Kramer, armed with a sword, refused to let the officers check on his wellbeing and threatened to attack Gordon with the sword if the officers did not leave.  The standoff ended when Kramer exited the home brandishing the sword and advanced on Gordon, who was unarmed.  Officers shot Kramer, who died hours later of injuries from Bollow's weapon.

Plaintiff Sydney Lerma, Kramer's mother and the administrator of his estate, has filed this action, alleging state law claims and Fourth Amendment claims under 42 U.S.C. § 1983 against Bollow and several other officers.  Plaintiff alleges that Bollow unreasonably used deadly force on Kramer, and that the other officers—lacking a clear plan and failing to follow best practices—unreasonably created a situation where the use of deadly force came into play.  All Defendants

moved for summary judgment on Lerma's federal claims [40] [41].  As explained here, the court grants those motions and relinquishes jurisdiction over Lerma's remaining state law claims.

## BACKGROUND

On summary judgment, the court construes the evidence in the light most favorable to Plaintiff.  That evidence includes, in this case, footage from the officers' body worn cameras.  The court views the available footage in the light most favorable to Plaintiff but notes where the video evidence adds necessary context to the facts as described by Plaintiff or even clearly discredits her assertions.  *See Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024).

At approximately 2:30 a.m. on October 25, 2021, Kristopher Kramer called 911 and reported that he wanted his girlfriend, Amy Totzke, to leave his home, located at 175 Tilton Park Drive in DeKalb, Illinois.  (Pl. Local Rule 56.1 Statement of Additional Material Facts [51] (hereinafter "PSOF") ¶ 1; Pl. Resp. to Defs. Local Rule 56.1 Statement of Undisputed Material Facts [52] (hereinafter "Pl. Resp. to DSOF") ¶ 1.)  Though his call suggested he wanted assistance, Kramer warned the dispatcher that "if any cop comes in here, I'm going to point my weapon at him and wait for him to shoot me."  (PSOF ¶ 1.)  The dispatcher explained to Kramer that in order to get Totzke out of his house, she (the dispatcher) would need to summon officers; when she asked whether that would be acceptable, Kramer insisted that if any officers "come here, I'm gonna kill myself."  (*Id.*)

Several law enforcement officers responded to the 911 dispatch, including Defendants Brian Bollow, Sonny Streit, Josef Gordon, and Justin Donahue.  (*Id.* ¶ 2.)  Approximately four to five other, non-Defendant officers were also on the scene that night, including patrol officers Betsy Cooper and Uriel Ortega, and patrol sergeant Kristopher Mecca.  (*Id.*)  At the time, Bollow, Gordon, and Donahue were patrol officers with the DeKalb Police Department, and Streit was a patrol sergeant with the department.  (*Id.*)  The 911 dispatcher had told them that Kramer had contacted 911 and wanted his girlfriend to leave.  (*Id.* ¶ 3.)  The dispatcher also reported that Kramer had "cut his wrists and [taken] a bunch of pills," and informed the officers that Kramer

reported having a weapon, but that Totzke (who presumably had also called 911 at some point) had confirmed that there were no guns in the house. (*Id.*; *see* Pl. Resp. to Mot. [57] (hereinafter "Opp.") at 2.) The dispatcher warned the responding officers that, despite supposedly having called because he wanted Totzke to leave, Kramer had also threatened that "if any officers come, he's gonna kill himself or he's gonna come out and make you guys shoot him." (*Id.*)

Kramer's home was a ranch-style, single-family house, oriented in a north-south direction and sitting on the east side of Tilton Drive. (Pl. Resp. to DSOF ¶ 2.) The front door was located approximately at the mid-point of the house, facing westward to the street. (*See id.* ¶¶ 2–3.) At the north end of the house, a driveway led to an attached garage. (*Id.*)

Defendant Bollow was one of the first officers to arrive at Kramer's residence. (PSOF ¶ 4.) When he arrived, Totzke, who was by then in the back yard, warned Bollow that Kramer was inside the house, alone, with a sword. (*Id.*) Bollow escorted Totzke to the front of the house, where she reported to Bollow and Officer Betsy Cooper[1] (who by that point had arrived on the scene) that Kramer was alone inside the house, was drunk, and had cut his wrists "like six times." (*Id.*) At 2:36 a.m., Bollow reported to his colleagues via radio that Totzke was now out of the house and that Kramer was alone in the house and was "barricaded at this time." (*Id.* ¶ 5.) Officers Streit, Gordon, and Donahue all heard Bollow's report and had either already arrived at the scene or were arriving at that time. (*Id.*) Gordon acknowledged at his deposition that the fact that Kramer was alone in his residence meant that there was "less urgency to the response" and gave Defendants more time to formulate a plan for dealing with the situation. (*Id.*)

The October event was not the first time that DeKalb police had interacted with Kramer. (*Id.* ¶ 7.) On August 28, 2021, Officer Streit had responded to Kramer's home following a report by the mother of Kramer's children that Kramer had sent her suicidal messages on the social

---

[1] In her statement of facts, Plaintiff initially identifies Gordon as the officer who arrived just after Bollow, but from context, it is plain that Cooper was the second officer on scene and that the initial reference was a typo. (*See* PSOF ¶¶ 4–6.)

media platform Snapchat. (*Id.*) During that encounter, Streit learned that an officer already on the scene had observed Kramer sitting in a car in his garage as exhaust fumes filled the garage. (*Id.*) During this encounter, Streit also heard the mother of Kramer's children say that Kramer was experiencing suicidal thoughts as a result of his breakup with her. (*Id.*) These circumstances were on Streit's mind when he arrived at Kramer's residence on October 25, 2021. (*Id.*)

Once Gordon and Streit had arrived at Kramer's residence on October 25, Bollow, Gordon, and Streit positioned themselves in Kramer's front yard, on the west side of the house. (Pl. Resp. to DSOF ¶ 9.) Bollow, who knew that Gordon had received crisis intervention training and was not displaying a weapon, stated that he (Bollow) would be "lethal," and "Joe" (Gordon) would "be words." (PSOF ¶ 13.) At this stage, Bollow had his sidearm unholstered and was pointing it down toward the ground. (*Id.*) Streit was armed with a taser. (Pl. Resp. to DSOF ¶ 11.) Defendant Donahue (also on the scene but positioned in the driveway on the north end of Kramer's house) was loading a "less-than-lethal" shotgun under Sergeant Mecca's supervision; Mecca reported via radio that Donahue had "less lethal." (PSOF ¶¶ 13–14.) [2]

At 2:37 a.m., Gordon knocked on the front door of Kramer's residence and yelled out to him, "Hey Kris!" a few times. (PSOF ¶ 13.) Kramer did not respond. (*Id.*) Bollow was standing behind Gordon to Gordon's left in the front yard, while Streit stood a bit farther behind Gordon to Gordon's right. (*Id.* ¶ 14.) Donahue and Mecca, meanwhile, remained in the driveway on the north side of the house. (*Id.*) At approximately 2:38 a.m., Cooper reported via radio that Totzke had seen Kramer take seven Klonopin (a depressant medication) and cut his wrists. (*Id.* ¶ 6.) By

---

[2]    Although it is not clear from the record, the court understands that Donahue was using a type of nonlethal ammunition called "bean bag" rounds (PSOF ¶ 32)—that term is undefined in the record, but to the court's understanding, these are "small fabric sack[s] filled with No. 9 lead shot." Janet Loehrke, Ramon Padilla, Jasper Colt & Shawn J. Sullivan, *'Less Lethal' Can Still Maim and Kill: A Visual Guide to Weapons Police Use on Protesters*, USA TODAY (Jun. 20, 2020), https://www.usatoday.com/in-depth/news/2020/06/20/less-lethal-rubber-bullet-protester-pepper-ball-tear-gas-injured-blinded/5343717002/; *see also Est. of Escobedo v. Bender*, 600 F.3d 770, 776 (7th Cir. 2010) (describing bean bag rounds as "meant to stun or disable a person.")

2:39 a.m., Bollow, Donahue, Gordon, and Streit were aware that Kramer was experiencing a mental health crisis, was suicidal, was barricaded alone in his residence with a bladed weapon, and was intoxicated from alcohol and Klonopin.  (*Id.*)

Three minutes later, at 2:42 a.m., Bollow asked Cooper whether "we ha[ve] any crime at this point" and specifically whether there was a "domestic."  (*Id.* ¶ 15.)  Cooper responded that Totzke had "said all he did was pull her hair."  (*Id.*)  A few seconds later, Kramer, speaking from inside the house, told Gordon, "go away," to which Gordon responded, "No, I can't go away.  I can go away if you show me that you're okay."  (*Id.*)

At 2:44 a.m., Streit called Defendant Robert Redel, who at the time was the Commander on call at the relevant DeKalb Police Department division.  (*Id.* ¶¶ 12, 15.)  Streit told Redel that they had a "barricaded subject," who had "pulled his girlfriend's hair, he's cut his wrists, and he's taken a bunch of pills.  Girlfriend's out of the house we just got the house surrounded . . . He's walking around with a samurai sword in the house."  (*Id.* ¶¶ 16.)  Redel's response is not clear from the record, but Streit continued, stating, "[I]t'd be a domestic battery, but he's also cut his wrists and walking around with a samurai sword after he took some pills, so we got the suicidal subject aspect as well."  (*Id.*)  Streit further reported to Redel that Kramer had been brought to the hospital on an earlier occasion for suicidal actions, and that according to the girlfriend, Totzke, the only weapons known to be in the home were knives and the sword.  (*Id.*)  Streit asked Redel whether he wanted a Special Operations Team called, but Redel responded by saying, "[n]ot at this time."  (*Id.* ¶¶ 9, 16.)

At 2:47 a.m., Bollow and Streit swapped positions behind Gordon in the front yard, putting Bollow on Gordon's right, and Streit to Gordon's left.  (*Id.* ¶ 17.)  A few minutes later, Kramer briefly walked into the back yard of his house but soon reentered the residence.  (*Id.* ¶¶ 17–18.)  At 2:52 a.m., Kramer came to a window of his home; attempting to negotiate, Gordon told Kramer, "I'm right here man" and asked, "Are you going to come out and talk to us, or no?"  (*Id.* ¶ 18.)  Kramer yelled at Gordon and the other officers to go away.  (*Id.*)  At 2:55 a.m., Kramer again

looked out the window; Gordon asked whether Kramer was willing to talk with him, but Kramer again yelled at Gordon to get off his property. (*Id.*)

At 2:58 a.m., Streit received a phone call from Commander Redel. (*Id.* ¶ 21.) Redel asked Streit whether a crime had occurred, and Streit responded by reporting that Kramer had "pulled the girlfriend's hair." (*Id.*) Redel also asked Streit, "Have we thought about leaving?" and Streit replied by acknowledging that the officers "could probably take her [Totzke] somewhere," but that he [Streit] did not "want to leave this guy all hyped up, with a samurai sword, just unattended, you know?" (*Id.*) Streit told Redel that Kramer "comes to the door occasionally, yelled at us, 'I will kill you,' and then goes back inside." (*Id.*) Redel told Streit that he was considering directing the officers to back off, and Streit passed that information along to Bollow, Gordon, and Mecca. (*Id.*) Mecca suggested the possibility of bringing in a "negotiator" to talk to Kramer; Streit responded that it was up to Redel to call those people in. (*Id.*) Around this time, Gordon asked his colleagues "what's our plan?" but did not receive a response. (*Id.*)

At 3:05 a.m., Sergeant Mecca offered Bollow a hand-held shield, but Bollow declined, saying, "I'm lethal, so I don't want to be holding a shield and trying to take a shot." (PSOF ¶ 21; Mecca Body Worn Camera Footage [55] at 31:32–32:00.) As Mecca later testified, however, officers can and do on some occasions provide lethal cover with a shield while simultaneously carrying a firearm. (PSOF ¶ 24.) After Bollow declined, Mecca instead offered the shield to Streit, saying "You want it then? Keep it nearby. I just figured, if he comes out with a sword or something, this would be much easier to deflect or to utilize against that." (Streit Body Worn Camera Footage [55] at 29:10–29:20; PSOF ¶ 21.) Streit also declined and suggested that Mecca provide the shield to Officer Ortega instead; Bollow, meanwhile, explained, in reference to the shield, "I don't intend on letting him [Kramer] get that close to me." (Streit Body Worn Camera Footage 29:20–29:22; Mecca Body Worn Camera Footage 31:58–32:00; PSOF ¶ 24.)

At 3:07 a.m. (presumably after yet another 911 call), a 911 dispatcher told Defendants via radio that Kramer had sent a text message to Totzke seven minutes earlier in which he told her,

"You've killed me. I hope you enjoy watching." (PSOF ¶ 26; DeKalb PD Radio Traffic Audio [55] at 10:37–10:46.) When Kramer re-appeared in the window at about 3:08 a.m., Streit instructed Gordon to ask Kramer whether he was alright and whether he wanted to talk to someone. (PSOF ¶ 27.) Gordon did so; he asked Kramer, "Are you ready to talk to us yet, or what?" (*Id.* ¶ 28.) Kramer responded, "no." (*Id.*) At this point, however, Kramer began to look out the window more frequently, including looking to the north end of the house, where Donahue was stationed with the non-lethal shotgun. (*Id.*)

Then, at 3:12 a.m., Kramer opened the front door to his house, leaving an attached, external storm door still closed. (*Id.*) The following exchange took place between Kramer and Gordon:

Kramer: "Where you at?"

Gordon: "Can we talk or what?"

Kramer: "Fuck no."

Gordon: "Why not man? How long are we gonna do this?"

Kramer: "Did you get my garage door opener from her?"

Gordon: "We can talk about that, I can ask her for the garage door opener, but I mean, can we talk about what's going on tonight?"

Kramer: "No."

Gordon: "'Cuz that's kinda what we need to do. We can't leave until we do that. So can we stop with that, and have a conversation? Can we have a conversation like men, man, and put all this other stuff away?"

Kramer: "No."

Gordon: "Cuz that-that's unnecessary. It's unnecessary, man."

Kramer: "I don't care."

Gordon: "You do care, 'cuz you keep coming to the door and we're talking. So you care about something."

Kramer: "I want to know if she's gone or not."

Gordon: "Huh?"

> Kramer: "I want to know if she's gone or not."
>
> Gordon: "She is. She is gone."
>
> Kramer: "Then what do you want?"
>
> Gordon: "We still gotta check on you, man."
>
> Kramer: "Fuck you."

(*Id.*)  Kramer closed the front door, and Gordon told Streit, "that's progress," to which Streit responded, "it is."  (*Id.*)  But a few seconds later, Kramer re-opened the front door (with the external storm door still closed) and told Gordon, "Get the fuck away from my house!"  Gordon responded, "I just told you, we're not.  Until we check on you—'cuz she claims that you hurt yourself—we gotta make sure you're okay." (*Id.* ¶ 29.)  Kramer then said, "I will come out here and fucking attack you with it."  (*Id.*)  Gordon responded, "You're not—you're not even there with it, man."  (*Id.*)

Footage from Gordon and Bollow's body-worn cameras shows that as Gordon was finishing his sentence, Kramer shifted his position, reaching for the inner handle on the storm door.  (Gordon Body Worn Camera Footage [47] at 37:24–37:28; Bollow Body Worn Camera Footage [47] at 40:53–40:57.)  As Kramer began turning the inner handle of the storm door, Gordon quickly said "alright, you ready?" to which Bollow, standing behind Gordon to Gordon's right, responded "yep, back up, back up."  (Bollow Body Worn Camera Footage at 40:57–40:58.)  What happened next took place over no more than five seconds:  As Bollow was telling Gordon to back up, Kramer opened the storm door and took a step onto his doorstep, saying "you wanna fucking bet?"  (Gordon Body Worn Camera Footage at 37:29–37:30; Bollow Body Worn Camera Footage at 40:57–40:58.)  As he stepped out, Kramer was holding the sword above his right shoulder, with the blade pointing outward in Gordon's direction.  (PSOF ¶ 30; Gordon Body Worn Camera Footage at 37:29–37:30.)  Streit and Bollow responded immediately:  Streit told Kramer to "stop," and Bollow told him to "put it down"; meanwhile, Gordon began stepping backward

slightly. (Streit Body Worn Camera Footage 37:24–37:26; Bollow Body Worn Camera Footage at 40:59–41:00; PSOF ¶ 31.)

Plaintiff asserts that "immediately upon exiting his residence, Kramer paused." (PSOF ¶ 31. Having reviewed the footage, the court concludes that a jury might well find that Kramer stopped moving (rather than simply slowing his movements), but if a pause did occur, it was very brief, lasting no more than half a second before Kramer began moving forward again. (*See* Gordon Body Worn Camera Footage 37:28–37:30.) As Kramer took another step, Bollow and at least one other officer again shouted at him to "put it down!" (Bollow Body Worn Camera Footage at 40:59–41:02.) With his next step, Kramer had stepped off his doorstep and onto a stone walkway leading in Gordon's direction, as Bollow again yelled "put it down!" (*Id*.; Pl. Resp. to DSOF ¶ 65.) Kramer took another step, and yet again, Bollow yelled "put it down!"; as Kramer finished that step, Bollow and Streit simultaneously discharged their firearm and taser, respectively; Donahue, who by this point had apparently moved toward the front door from the north end of the house, also took a shot at Kramer from his non-lethal weapon. (*Id*.; PSOF ¶ 31.)

All three shots struck Kramer, who collapsed to the ground. (PSOF ¶¶ 31–32.) Streit picked up the sword and tossed it away from Kramer as the other officers cuffed Kramer's hands behind his back and began providing medical assistance. (Pl. Resp. to DSOF ¶ 68.) Kramer was taken to Kishwaukee Hospital in Sycamore, Illinois, where he died at 4:55 a.m. as a result of the gunshot wound to his chest from Bollow's firearm. (PSOF ¶ 35; Kramer Autopsy Report [53-17] at 2–3.)

Plaintiff denies that Kramer was advancing toward Gordon when he was shot, or at least believes Kramer was "not advancing at Gordon specifically." (Pl. Resp. to DSOF ¶ 65.) Instead, Plaintiff asserts, Kramer's "feet were pointed to the left of Gordon and he was simply walking forward generally." (*Id*.) As the court views this evidence, it might support a jury finding that Kramer was not tracing a perfect beeline toward Gordon (perhaps in part because Gordon himself was shifting in response to Kramer's advance), but the available body-worn camera footage

leaves no question that Kramer was walking in Gordon's direction. (*See* Gordon Body Worn Camera Footage at 37:28–37:31; *see also* Streit Body Worn Camera Footage at 37:20–37:28.)

Precisely how close Kramer was to Gordon before shots were fired is not clear. Bollow says Kramer was "within a few feet" of Gordon (Bollow Mem. [42] at 4, 7), while Plaintiff asserts that Kramer was "more than seven feet away." (Opp. at 17.) The court is certain that Kramer was farther than a "few" feet away but cannot confidently put a figure on the distance. It is safe to say that Kramer was not yet within striking distance of Gordon but could have closed the gap very quickly—almost certainly within a couple of seconds—if he were to spring forward. (*See* Gordon Body Worn Camera Footage at 37:28–37:34; Streit Body Worn Camera Footage at 37:24–37:28.)[3]

## LEGAL STANDARD

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law." *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). When considering a motion for summary judgment, courts must "view the record in the light most favorable to the nonmoving party." *Id*.

## DISCUSSION

Plaintiff alleges that Defendants violated the Fourth Amendment in two ways. As against Defendant Bollow, Plaintiff alleges that his use of deadly force against Kramer was unreasonable. The remaining Defendants are liable, Plaintiff alleges, for "recklessly creat[ing] the need to use

---

[3]     Based on Streit's footage, it is quite possible that Streit—facing Kramer at an angle from Gordon's left—was the officer closest to Kramer at the time Bollow fired; as Kramer advanced toward Gordon, Streit stepped slightly closer to Kramer, who was brandishing the sword, while Gordon stepped backward. (Streit Body Worn Camera Footage at 37:24–37:28.)

deadly force against Kramer." (Opp. at 11.)  Defendants have raised qualified immunity defenses to these claims.[4]

"Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it."  *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).  To overcome the qualified immunity defense, Plaintiff must demonstrate not only (1) that the facts, when viewed in the light most favorable to her, establish a violation of Kramer's constitutional rights, but also (2) that the Defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time.  *Gaddis v. DeMattei*, 30 F.4th 625, 632 (7th Cir. 2022) (internal citations omitted).  To satisfy the second prong of the qualified immunity analysis, Plaintiff must "point to cases establishing a rule" that would make Defendants' liability "obvious" at the time of the alleged violation; the case need not be "directly on point," but Plaintiff may not rest on "generalities."  *Id.* (internal citations omitted).  As the Seventh Circuit has emphasized, "this precision is particularly important in the context of the Fourth Amendment," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  Because the second prong of qualified immunity is often conclusive, courts may begin their analysis there.  *Gaddis*, 30 F.4th at 632 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

As explained in more detail below, the court concludes that Defendants are entitled to qualified immunity on Plaintiff's federal claims because Plaintiff has failed to establish that the Defendants' conduct violated clearly established law.

---

[4]    Plaintiff recognizes that this court is bound to apply the qualified immunity doctrine "until and unless the Supreme Court holds otherwise" but preserves an objection, citing recent scholarship in support of the argument that the qualified immunity doctrine "has no basis in the text of § 1983."  (Opp. at 22–23.)

11

I.      **Use of Force by Bollow**

When evaluating the reasonableness of deadly force, courts "focus on the danger posed by the person to whom the force was applied.  This requires asking 'whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others.'"  *Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) (quoting *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018)).  For an officer to have probable cause, the officer's belief "need not be 'correct or even more likely true than false, so long as it is reasonable.'"  *Gaddis*, 30 F.4th at 630 (internal citations omitted).

As a general matter, deadly force may be used if a suspect "threatens the officer with a weapon."  *Biegert*, 968 F.3d at 699–700.  Faced with such a threat, "police officers may resort to deadly force 'even if a less deadly alternative is available to the officers.'"  *Id.* at 700 (quoting *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020)).

In this case, the following details are undisputed, or at least beyond reasonable dispute.  About ten seconds before Bollow fired, Kramer, standing just inside his front door, had stated to Gordon: "I will come out here and fucking attack you with it," referring to a sword the officers knew Kramer possessed.  About five seconds before he was shot, Kramer opened his front door, and took a step out onto his doorstep, with the sword raised above his right shoulder and blade pointing outward towards Gordon.  As Kramer stepped out, he responded to Gordon's statement that Kramer "was not even there with it" by saying, "you wanna fucking bet?"  Then, in the few seconds before Bollow fired, several officers yelled at Kramer to put the sword down, but Kramer did not comply—instead, he continued advancing toward Gordon with the sword still raised above his right shoulder and pointed at Gordon.[5]

---

[5]      Plaintiff argues that whether Kramer had time to comply with these orders before he was shot is a jury question.  (Opp. at 17.)  Perhaps a jury could agree that two or three seconds of being yelled at was not, in fact, enough time for Kramer to process the order, but in the court's view, no reasonable jury could conclude that it was objectively unreasonable for the officers to believe that Kramer was ignoring their commands.

Bollow is entitled to qualified immunity on this claim. Rather than engaging with the general rule of *Biegert* that an officer may use deadly force if threatened with a weapon, Plaintiff has staked out the confounding position that Kramer—the person who advanced out of his house with a sword raised and pointed at the officers who he had just threatened to attack—"made no threatening gestures" or "hostile motions" towards the officers here at all. (Opp. at 18.) Put simply, the argument does not persuade the court that *Biegert* is inapplicable here.

The Seventh Circuit's decision in *King v. Hendricks Cnty. Comm'rs* is particularly instructive. 954 F.3d 981 (7th Cir. 2020). Bradley King, a 29-year-old man who suffered from paranoid schizophrenia, was killed by a police officer on November 29, 2016, after an encounter that started as a "welfare check" "spun horribly out of control." *Id.* at 983. King had called 911 that afternoon and requested help; defendants, two deputies named Hays and Thomas, responded to King's home. *Id.* As the Seventh Circuit summarized the events, upon the deputies' arrival,

> Bradley came out of the house, walked toward them, and pulled a ten-inch knife out of his shorts pocket. Hays and Thomas backpedaled, drew their service firearms, and yelled at Bradley to stop and drop the knife. Bradley disregarded their commands and kept moving forward. Then, with the knife in his left hand, left arm raised in front of him so that the blade was pointing toward the officers, he started running at Hays. When Bradley was approximately eight feet away, Hays fired one shot. It proved to be fatal.

*Id.*

The plaintiff in *King*—Bradley's father—disputed the officers' version of events, but the court found that most of the evidence he presented did "not undermine the officers' account," and his theory "that the officers shot Bradley for no reason and planted the knife on him" was supported by no more than "speculation or conjecture." *Id.* at 985–86.[6] Accepting the defendant officers' unrebutted account—that "Bradley pointed a large knife at them, disregarded their

---

[6] The *King* court, unlike this one, did not have the benefit of body worn camera footage, which often functions as neutral, eyewitness testimony of what happened at the scene of a police use-of-force incident.

repeated commands to drop the knife, and then charged at Hays"— the Seventh Circuit concluded that "Hays's use of deadly force was constitutionally reasonable." *Id.* at 985. The *King* court reached this conclusion even as it recognized that "a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate" and that "officers often should approach persons known or suspected to have a mental-health problem differently from the way they handle those whom they suspect of criminal activity." *Id.* at 984 (internal citations omitted). Just a few months after the decision issued in *King*, the Seventh Circuit reaffirmed that reasoning in *Biegert*. *See* 968 F.3d at 700 ("in *King* . . . we concluded that officers reasonably used deadly force during a welfare check when a mentally unstable man 'pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged' at the officers.")

The facts of *King* are not a perfect match to those at issue here, but the two situations are quite similar, providing powerful support for Bollow's qualified immunity defense. Plaintiff—who bears the burden of defeating that defense, once asserted—claims that "shooting a suicidal suspect when he is not a threat violates clearly established law." (Opp. at 14.) Thus, Plaintiff contends, summary judgment is not appropriate here because "whether Kramer was an immediate threat when Bollow fired his gun—particularly considering all that transpired prior to Bollow's use of lethal force—is for the jury to decide."[7] (Opp. at 9.)

The problem with Plaintiff's framing is that she is operating at too high a level of generality with respect to the second prong of the qualified immunity analysis. There is no question that it is unreasonable for an officer to shoot a person who poses no threat to anyone, whether that

---

[7] Clearly established law aside, the court notes that the relevant question for determining whether Bollow violated the Fourth Amendment is not whether a jury could conclude Kramer was not an immediate threat to Gordon, all things considered. Instead, as caselaw quoted by Plaintiff herself explains, the court's "task at summary judgment" is "to determine, under [Plaintiff's] version of the facts, if [Bollow] was *objectively reasonable in his belief*" that Kramer posed an immediate threat to Gordon. (*See* Opp. at 9 (quoting *Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (emphasis added)).)

person is suicidal or not.  The issue is whether the law, as it existed at the time of the incident, would have put Bollow on notice that Kramer's behavior did not justify the use of lethal force.

Plaintiff has failed to discuss *King* in her briefing at all.  Instead, Plaintiff primarily relies on *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015) and *Williams v. Ind. State Police Dep't*, 797 F.3d 468 (7th Cir. 2015).  (*See* Opp. at 15–17.)  Neither case clearly establishes that Bollow's use of force was objectively unreasonable.  In both *Weinmann* and *Williams*, there was a genuine dispute about whether the victim had threatened police officers with a weapon.  In this case, there is no question that Kramer had threatened to attack Gordon with the sword, and a few seconds later, stepped out of his house, pointing the sword at Gordon and advancing on him despite the officers' commands.

In *Weinmann*, the plaintiff had gone to his garage, drunk half a bottle of vodka, and put the barrel of a shotgun in his mouth, but found himself unable to pull the trigger.  787 F.3d at 446.  Weinmann's wife called 911 for help; McClone, the responding officer, made a forced entry into the garage within three minutes of arriving, kicking the door in without trying to speak with Weinmann through the door or otherwise announcing his entry.  *Id.*  Weinmann "never pointed the gun" at McClone, but McClone shot him four times, injuring him with each shot.  *Id.* at 447.  In the resulting lawsuit alleging excessive force, the district court concluded that McClone was not shielded from liability by qualified immunity, and the Seventh Circuit agreed, observing that McClone had allegedly shot Weinman when he was "passively sitting in a chair with the gun across his lap", and "neither resisting arrest nor threatening anyone save himself."  *Id.* at 451.  *Weinmann* recognized that an individual does not necessarily pose "an immediate threat of serious harm" solely because he is armed (*see Biegert*, 968 F.3d at 700), but the facts of *Weinmann* otherwise could not have made it obvious to Bollow that shooting Kramer would be unlawful.

*Williams* resolved two appeals—the relevant one here is the second case, involving a man named John Brown.  797 F.3d at 480–81.  Brown's mother had called 911 because Brown had

15

cut his wrist with a folding knife and locked himself in his room. *Id.* at 481. A responding officer arrived at the scene and, within two minutes, shot Brown, killing him. *Id.* The district court found a "genuine issue of fact as to whether [Brown] was in fact threatening the officers with a knife at the time he was shot," precluding qualified immunity. *Id.* As in *Weinmann*, the Seventh Circuit agreed. Crediting plaintiff's version of disputed facts, defendant had used deadly force though Brown was "merely passively resisting" the officers' entreaties and had made no threats of violence toward the officers or anyone else. *Id.* at 484. The case before this court differs; there is no reasonable basis to dispute Defendants' assertions that Kramer *had* made threats of violence toward Gordon and was not merely "passively resisting" the officers' commands when he was shot: Kramer was advancing on Gordon with the sword pointed at the officer.

In addition to *Weinmann* and *Williams*, Plaintiff also cites several out-of-circuit cases. (*See* Opp. at 18–19.) It is true that, in the absence of controlling precedent, a "robust consensus of cases of persuasive authority" can make a rule into "settled law." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal citations omitted). In this case, however, controlling cases— *Biegert* and *King*— are already working against Plaintiff; and in this court's view, the other cases she cites do not support her position.

Plaintiff's strongest out-of-circuit case is *S.B. v. Cnty. of San Diego*; there, an officer had shot a "mentally ill and intoxicated individual" who had been "acting aggressively," and, despite initially complying with orders to kneel while six to eight feet away from the officers, soon "grabbed a knife with a six-to-eight-inch blade from his back pocket." 864 F.3d 1010, 1014 (9th Cir. 2017). Further, there was evidence that the officer shot the victim "as soon as [the victim's] hand touched the knife," and that once the victim "went for the knife, the officers did not order him to drop the knife or warn that he was about to be shot." *Id.* On plaintiff's version of the facts, the Ninth Circuit concluded that a reasonable jury could find a Fourth Amendment violation; it nevertheless held that in the absence of precedent "that put [defendant] on clear notice that using deadly force in these particular circumstances would be excessive," the district court erred in failing to grant

qualified immunity. *Id.* at 1015. In this court's view, the Ninth Circuit's *S.B.* case could not have provided "clear notice" to Defendants here that their conduct was unlawful in light of critical differences between that case and this one: (1) When Bollow shot Kramer, Kramer was upright and advancing on Gordon with the sword brandished, rather than being on his knees and in the act of grabbing a knife from his back pocket; and (2) Bollow fired only after Kramer, while advancing, had failed to respond to several warnings over the course of two or three seconds.

In *Russo v. City of Cincinnati*, the officer, "in an effort to obviate the need for lethal force," initially used a taser on "a potentially homicidal individual" who stood facing the officers "a few feet" away, "was armed with knives," and "had made a number of threatening statements to the officers." 953 F.2d 1036, 1044–45 (6th Cir. 1992). Although the Sixth Circuit granted qualified immunity, *Russo* is useful for Plaintiff in the sense that it featured an officer attempting to subdue a subject with a similar profile to Kramer without resorting to lethal force. But *Russo* did not hold (or even suggest) that the use of lethal force in those circumstances would have been unlawful.

In the remaining five cases, the courts found Fourth Amendment violations, but in each case, there was a genuine dispute as to whether the victim had threatened the officers at all— which is not the case here. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1164–65 (10th Cir. 2015) (jury could have found that victim "made no hostile motions toward the officers but was merely holding a small kitchen knife loosely by his thigh," and that, for all the officer knew, victim "had threatened only himself" and was not "speaking hostilely at the time of the shooting"); *Mercado v. City of Orlando*, 407 F.3d 1152, 1154, 1157 (11th Cir. 2005) (viewing facts in the light most favorable to victim, when found by officers he "was holding [a] knife in both hands and pointing it toward his heart" and there was "no indication that he made any threatening moves toward the police" before use of force); *Cole v. Carson*, 935 F.3d 444, 449 (5th Cir. 2019) (reasonable jury could find that, when victim was shot, he was "holding his handgun pointed to his own head" and had "never pointed a weapon at the [o]fficers"); *Baker v. Putnal*, 75 F.3d 190, 198–99 (5th Cir. 1996) (there were disputes about whether, at the time the victim was shot by police, the victim took any

17

"threatening action" as officer approached his truck, "had an opportunity to see" the approaching officer, or "was even holding [a] pistol or pointing it at" the officer); *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 220 (4th Cir. 2018) (granting qualified immunity, but finding an underlying Fourth Amendment violation where the victim was holding a pocket knife but "never pointed the pocket knife in the direction of anyone but himself" and did not "move suddenly or act in a threatening manner toward" officers.)

Bollow is entitled to qualified immunity.

## II.     Creation of a Dangerous Situation by the Other Officers

Plaintiff maintains that the remaining individual Defendants—Donahue, Gordon, Redel, and Streit—are independently liable under the Fourth Amendment because "they recklessly created the need to use deadly force against Kramer." (Opp. at 11.) In particular, Plaintiff cites evidence that the Defendants: "(1) failed to apply their knowledge of prior interactions with Kramer; (2) failed to devise a plan; (3) failed to create a proper chain of command; (4) failed to establish a sensible perimeter; and (5) actively provoked Kramer," purportedly in that, after Kramer had threatened to attack him with a sword, Gordon responded by saying, "you're not even there with it, man." (*Id.* at 12, 17.) Plaintiff also contends that the officers violated DeKalb Police Department policies that would have required them to engage in de-escalation tactics and announce their intent to discharge their less-than-lethal weapons. (*Id.* at 3–5.)

This claim fares no better than the one against Bollow. The general rule is that "even if the officers misjudged the situation, [plaintiffs] cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'" *Biegert*, 968 F.3d at 698 (quoting *City & Cnty of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015)). This is true even if the officers "made mistakes" that "provoked [the plaintiff's] violent resistance." *Biegert*, 968 F.3d at 698.

As the *Biegert* court explained, the Seventh Circuit has held "only in narrow circumstances . . . that an officer acted unreasonably because he created a situation where deadly force became

essentially inevitable." *Id.* The only two cases this court is aware of that present such "narrow circumstances" plainly differ from this one. In *Est. of Starks v. Enyart*, the court held that the plaintiff's evidence could support a finding that an officer "unreasonably created the encounter that ostensibly permitted the use of deadly force" when the officer "stepped in front of" a "rapidly moving cab" driven by the victim, Starks, leaving Starks "no time to brake" and leading the officer's colleagues to shoot Starks. 5 F.3d 230, 234 (7th Cir. 1993). Although Starks had stolen the cab and was attempting to evade apprehension, in his estate's version of the facts, the officers knew that Starks had not stolen the cab by violent means and "his escape attempt did not involve menacing a police officer or civilian with a weapon—at least not until [the officer] stepped into the path of a car that had just begun to accelerate quickly." *Id.* at 233.

In *Sledd v. Lindsay*, the plaintiff presented evidence that the defendant officers, executing a search warrant at night, had broken down his door without knocking or identifying themselves as police; none of the defendants were in full uniform and at least one was in plain clothes, wearing "blue jeans, a blue jacket, and white tennis shoes." 102 F.3d 282, 286 (7th Cir. 1996). Sledd had begun walking down the stairs of his house when he heard banging on the door, but "raced back up the stairs" to retrieve his rifle from his bedroom upon the entrants breaking through the door. *Id.* The plain-clothes officer followed Sledd upstairs to his bedroom but turned and ran upon seeing Sledd with the rifle; Sledd gave chase down the stairs, where the plain-clothes officer—who in Sledd's telling had *still* not identified himself—shot Sledd. *Id.* The Seventh Circuit held that, under Sledd's version of the facts, the plain-clothes officer had "unreasonably created the encounter that led to the use of force"; the court explained that "in a situation where a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified." *Id.* at 288.

Neither *Starks* nor *Sledd* is factually similar to this case, and Plaintiff has not satisfied the court that either of those cases would have put Defendant officers on notice that their conduct violated the Constitution. Instead, Plaintiff has only gestured at the general proposition that

"officers are liable under the Fourth Amendment if their conduct falls 'so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions.'" (Opp. at 11 (quoting *Biegert*, 968 F.3d at 698).)

Kramer's death is a tragedy, and there is room to criticize the officers' conduct in this case. The evidence shows the Defendant officers understood (or should have understood) that Kramer was entertaining the idea of "suicide by cop" and might force the situation specifically by exiting his house with the sword and provoking the officers into shooting him. Officer Gordon, of course, attempted to engage Kramer verbally and persuade him to let the officers check on his wellbeing. But in spite of the fact that Kramer did not exit his house "for nearly 40 minutes" after the officers arrived (Opp. at 1), there is no evidence that the officers formed a plan to (or even discussed the possibility of) trying to subdue Kramer with non-lethal force before resorting to lethal force in the event Kramer emerged from the house with the sword, as he had threatened to do. (*See* PSOF ¶ 34.) As explained in the proffered testimony of Plaintiff's expert Brian Landers,[8] the perimeter that Bollow, Donahue, Gordon, and Streit constructed around Kramer's house—with the officers all standing within 10–15 feet of Kramer's front door— was not "appropriate for the situation." (PSOF ¶ 37.) The officers' lack of a "unified plan" and their unnecessary proximity to Kramer's door, Landers concludes, combined to create a confusing situation once Kramer exited the house; subsequently, Bollow, Donahue, and Streit ended up firing their lethal and non-lethal weapons almost simultaneously. (*Id.*) In stating those conclusions, Landers's testimony relies on DeKalb Police Department policies as a reference point (*see, e.g.,* Landers Expert Report at 13–19), but

---

[8]     Landers served as a police officer with the Wisconsin Dells, Wisconsin police department for over fifteen years, reaching the rank of lieutenant, before becoming a full-time professor of criminal justice at Madison College in Madison, Wisconsin in 2010. (Landers Expert Report [53-18] at 7, 9.) During his time as a police officer, Landers was appointed by the Wisconsin Department of Justice to serve on a Law Enforcement Ethics Advisory Committee, and a Tactical Advisory Committee; as part of these appointments, Landers helped develop police training protocols and curricula on ethics, tactics, and decision-making. (*Id.* at 8.)

also relies on his own experience and "generally recognized and nationally accepted standards." (*Id.* at 11.)

Defendants contend Landers's testimony is of little value because, as the Supreme Court has held, "even if an officer acts contrary to her training . . . that does not itself negate qualified immunity where it would otherwise be warranted."[9] (Bollow Reply at 6 (quoting *Sheehan*, 575 U.S. at 616).) Indeed, violations of local policy or training alone cannot establish Fourth Amendment liability (*see Biegert*, 968 F.3d at 699) or overcome qualified immunity. And, as the Seventh Circuit recognized in *United States v. Brown*, "[e]vidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy," since the jury's task "is to determine how a reasonable officer would act in the circumstances, not how an officer in a particular local police department would act." 871 F.3d 532, 538 (7th Cir. 2017). This does not mean, however, that "evidence of police policy or procedure will *never* be relevant to the objective-reasonable inquiry." *Id.* at 537. The question, as always, is whether the expert's specialized knowledge can "'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting FED. R. EVID. 702(a)).

In this case, even with the benefit of Landers's testimony, Plaintiff is not able to establish that the officers' conduct went beyond "bad tactics that result[ed] in a deadly confrontation that could have been avoided" (which would not be a Fourth Amendment violation) and crossed into the realm of "behavior so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions" (which would). *Biegert*, 968 F.3d at 698 (emphasis added). And in any event, as discussed above, the decisive problem for Plaintiff is that she has

---

[9]     Defendants also argue that Landers's report should be disregarded "because it is not sworn testimony" and "relies on hearsay as facts," but these arguments are meritless. (Bollow Reply [60] at 6.) Landers' testimony *is* sworn. (*See* Landers Expert Report at 2 (signed expert declaration).) And Defendants identify no hearsay within Landers' report; moreover, expert testimony may rely on hearsay so long as such reliance "is an accepted practice" in the expert's line of work. *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015).

failed to show that existing law at the time of this tragic incident would have made it obvious to the officers that their tactics violated the Constitution.

Officers Donahue, Gordon , Streit, and Redel are entitled to qualified immunity.

## CONCLUSION

For the reasons explained above, the Defendants' motions [40, 41] are granted. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). The court will do the same here and relinquish jurisdiction over Plaintiff's remaining state law claims.

ENTER:

Dated: March 7, 2025

_____

REBECCA R. PALLMEYER
United States District Judge

22